Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 3597 | DATE | 11/15/2000 |
| CASE TITLE | Great Neck Capital Appreciation vs. Richard A. Drexler | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ______.

(3) ☐ Answer brief to motion due______. Reply to answer brief due______.

(4) ☐ Ruling/Hearing on ______ set for ______ at ______.

(5) ■ Status hearing set for 29 Nov. 00 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(7) ☐ Trial[set for/re-set for] on ______ at ______.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ______ at ______.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion to dismiss is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | NOV 16 2000 date docketed | 48 |
| | Notices mailed by judge's staff. | | docketing deputy initials | |
| | Notified counsel by telephone. | | date mailed notice | |
| ✓ | Docketing to mail notices. | ED-7 FILED FOR DOCKETING 00 NOV 16 AM 8:07 | mailing deputy initials | |
| | Mail AO 450 form. | Date/time received in central Clerk's Office | | |
| | Copy to judge/magistrate judge. | | | |
| WAP | courtroom deputy's initials | | | |

FILED

NOV 15 2000

Judge Harry D. Leinenweber
U. S. District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE ALLIED PRODUCTS CORP., INC. SECURITIES LITIGATION | Case No. 99 C 3597<br>Judge Harry D. Leinenweber |

DOCKETED
NOV 16 2000

MEMORANDUM OPINION AND ORDER

This is a securities fraud action brought by a group of investors against Allied Products, Corp. ("Allied") and various of its officers and directors. Defendants seek dismissal pursuant to FED. R. CIV. P. 12(b)(6).

BACKGROUND

This is plaintiffs' Second Amended Class Action Complaint ("Complaint"). As before, for purposes of this motion, the Court accepts all well-plead factual allegations of the Complaint as true. *Travel All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir. 1996).

Plaintiffs are individuals who purchased common shares of Allied stock during the period between February 6, 1997 and March 11, 1999. Defendant Allied is a Delaware corporation in the business of manufacturing agricultural and industrial machinery. Beginning in 1996, Verson, the industrial machinery division of Allied, embarked on a plan to enter the market for the production of customized mechanical and hydraulic transfer presses ("A Presses"). The A Press business had been previously occupied almost exclusively by foreign companies. The major customers for



the A Presses are the U.S. automakers who use the presses to fabricate machinery for the manufacture of their own products.

The A Presses, however, are very difficult to produce. In 1996, Verson accepted its first orders for A Presses from the Ford Motor Company. But when Verson began actual production on the Ford orders in 1997, it ran into immediate problems. Verson's facility was too small, its machinery was antiquated, and its engineering skills were deficient. This led to increasing costs and delays. Despite the problems, Verson accepted additional orders for customized presses from General Motors and Chrysler Motors in 1997 and 1998. At the same time, Verson continued to accept orders for its standard products. Unfortunately, the combined effect of attempting to meet all the new and old business was disastrous. Verson suffered from serious capacity limitations, bottlenecking, malfunctions, and delays on the contracts despite expensive attempts to expand facilities and to outsource their work.

The plaintiffs claim that the individual defendants were aware at all times of the magnitude of the problems at Verson. However, the individual defendants disseminated false and misleading public statements in order to perpetuate the fiction that Verson was making successful inroads against competitors in the A Press market. This fraudulent scheme was furthered through accounting manipulations and omissions of material information.

Specifically, the plaintiffs allege that Allied fraudulently overstated its earnings figures for all of 1996, 1997 and portions of 1998 by failing to recognize certain compensation expenses. Allied also accounted for the customized press contracts by means of the "percentage-of-completion" method, which allows a firm to recognize sales, costs, and profits over the lifetime of a contract. According to generally accepted accounting principles ("GAAP"), the percentage-of-completion method is only appropriate on substantial projects lasting longer than a year where reasonably dependable estimates of progress toward completion, revenues, and costs can be made. However, the plaintiffs allege that the defendants knew or recklessly failed to know that they could not make reasonably dependable estimates of costs for the customized press contracts. In fact, the plaintiffs claim that the percentage-of-completion method was utilized precisely so that the defendants, through another disapproved accounting method called the "reallocation method," could defer reporting escalating cost figures to subsequent reporting periods rather than recognizing those costs immediately.

In addition to the percentage-of-completion method and the reallocation method, Allied also began in 1997 to measure progress on the customized press contracts by means of the "contract milestones" method as opposed to the usual "labor hours" method that Allied relied upon in previous years. The plaintiffs allege

that this change in accounting method was not timely disclosed to the public in accordance with APB Opinions and SEC reporting rules. Again, the plaintiffs' theory is that the "contract milestone method" was hidden from the public because the method worked in conjunction with the other accounting methods to accelerate revenue and defer known cost overruns to later periods.

The full truth was not revealed until March 11, 1999 when Allied announced that the company would restate its net income for the years 1996, 1997 and a portion of 1998, and delay the filing of its 1998 Annual Report. As admitted later in Allied's Amended 1998 Annual Report, restatements were necessary to the 1997 and 1998 earnings figures because cost revisions that should have been recognized in the fourth quarter of 1997 were, instead, recognized in 1998 by means of the "reallocation" method. Furthermore, Allied disclosed that in attempting to fulfill both the A Presses orders and standard orders, Verson's production capacity was severely strained, that expansion efforts undertaken in 1997 and 1998 were not completed soon enough, and that Verson was unable to estimate costs accurately. Allied also stated that restatements for previously reported earnings were necessary to take into account certain omitted employee compensation expenses. The omitted compensation expenses for 1996, 1997 and 1998 amounted to $2.9 million, $900,000, and $700,000 respectively. When the news

of the restatements initially broke on March 11, 1999, the stock dropped 17% to around $3 per share.

## DISCUSSION

### Standard of Review

As this motion is one for dismissal pursuant to FED. R. CIV. P. 12(b)(6), the Court will dismiss only if it appears beyond doubt that plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). However, the Court is not required under this standard to ignore any of plaintiffs' own allegations that actually demonstrate that they are not entitled to judgment. *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 79 (7th Cir. 1992). It is possible for plaintiffs to plead themselves out of court. *Id.*

As with the plaintiffs' earlier complaint, the Second Amended Class Action Complaint asserts two counts: Count I alleges securities fraud against all defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; Count II alleges a claim against the individual defendants as "control persons" pursuant to Section 20(a) of the Act, 15 U.S.C. § 78t(a). To state a § 10(b) and Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that

reliance proximately caused plaintiff's injuries. *In re Healthcare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996). Since a § 20(a) claim is merely a derivative claim, cognizable against a defendant only where an underlying violation is alleged, the survival of Count II depends upon whether plaintiffs sufficiently allege a violation of § 10(b) and Rule 10b-5. 15 U.S.C. § 78t(a).

In evaluating the sufficiency of a claim for securities fraud, the Court must dispense with general notice pleading requirements and apply a heightened pleading standard. The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires plaintiffs to "specify each statement alleged to have been misleading" and "with respect to each [fraudulent] act . . ., state with particularity facts giving rise to a strong inference that the defendants acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(1), (2). The requisite state of mind for securities fraud is an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). This includes reckless disregard for the truth, where recklessness is understood as conduct that is so unreasonable it represents an extreme departure from the standards of ordinary care. *Chu v. Sabretek Corp.*, 100 F. Supp.2d 815, 822-23 (N.D. Ill. 2000)("*Chu I*"); *Danis v. USN Communications, Inc.*, 73 F. Supp.2d 923, 937-38 (N.D. Ill. 1999); *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997).

While the PSLRA does not change substantively the scienter requirement, it does raise the bar in terms of pleading the element. *Chu I*, 822-23. But contrary to some litigants' understandings, the PSLRA does not mandate that any particular set of facts be alleged to meet it. No matter what types of facts are offered, all that the plain language of the act requires is that they raise a "strong inference" of conscious misconduct with respect to each alleged fraudulent act. *In re Allied Products Corp., Inc. Sec. Litig.*, No. 99 C 3597, slip op. at 7 (N.D. Ill. March 13, 2000); *see also, Chu I*, 100 F. Supp.2d at 833.

In this case, the alleged misstatements and omissions fall into two distinct categories: (1) the failure to properly account for certain compensation expenses; and (2) the deferred reporting of cost escalations at the Verson division and defendants' failure to disclose the true state of affairs with respect to it's a Press business. Defendants submit that the entirety of the complaint should be dismissed for failure to adhere to the PSLRA. The Court finds that the defendants are only partially correct.

**Compensation Expenses**

As with its earlier complaint, the plaintiffs fail to raise a strong inference of conscious misconduct with respect to defendants' omission of compensation expenses in its 1996, 1997 and 1998 financial statements. Bare allegations of GAAP violations generally do not raise a strong inference of scienter. *See Chu v.*

*Sabretek Corp.*, 100 F. Supp.2d 827, 838 (N.D. Ill. 2000)("*Chu II*"). For improper accounting to amount to securities fraud, plaintiffs must also show that the defendants recklessly disregarded or acted with gross indifference to any misrepresentations caused by the violation. *Id.; Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1254 (N.D. Ill. 1997).

Plaintiffs assert that given the size of the compensation expenses and the positions of responsibility held by the defendants, the omission of such expenses was too obvious to have been the result of honest mistake. "[M]agnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors." *Rehm*, 954 F. Supp. at 1256. According to the Complaint, Allied omitted about $2.9 million in compensation expenses in 1996, $900,000 in 1997, and $700,000 in 1998. (Cplt. ¶ 95(a)). The largest omission, in 1996, overstated net income by 18%, from $16 million to about $19 million. (*Id.* at ¶ 96).

While the omissions are not minuscule, they do not approach the kind of restatements found by other courts to indicate actionable recklessness. *See, e.g.*, *Chu II* at 839-40 (defendants improperly accounted for certain expenditures as "intangible assets" despite the fact that as a result of the accounting, intangible assets comprised 21% of the defendant company's total assets whereas previously, intangible assets comprised for only 1%

of its total assets; the accounting irregularity resulted in overstatement of earnings by $39 million); *Rehm*, 954 F. Supp. at 1256 (the restatement slashed yearly earnings from $3.5 million to $325,000); *Rothman v. Gregor*, 220 F.3d 81, 88, 92 (2d Cir. 2000)(the restatement announced an additional $73.8 million in expenses for one quarter, resulting in an operational loss of $25 million for the year). Nor do the plaintiffs suggest that the omissions involved such a central part of the defendants' business that any significant accounting discrepancy should have been detected immediately. *See Rehm*, 954 F. Supp. at 1256 (the accounting discrepancy involved a "defining characteristic" of the defendant's business).

Plaintiffs also suggest that the omissions were critical to the success of defendants' overall fraudulent scheme in that the resulting overstatements in income permitted Allied to meet certain debt covenants and, in turn, obtain credit to expand into the A Press market. (Pltf. Reps. at 15-16). However, the desire to maintain credit is a goal held generally by other corporate executives and, as such, is insufficient to raise an inference of fraud. *See, e.g., Chu II*, 100 F. Supp.2d at 841. Absent indication that Allied had particular problems with its creditors in obtaining cash or renegotiating credit agreements, such allegations do not carry much weight. *Cf., Rehm*, 954 F. Supp. at 1253 (general averments of a desire by defendant to maintain

reputation in the capital markets without weight where plaintiffs did not allege a single instance of the defendant actually seeking to acquire capital); *see also Novak v. Kaskas*, 216 F.3d 300, 307-08 (2d Cir. 2000)(plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud"). In fact, in the third quarter of 1998 - prior to the end of the class period - when defendants did report large losses at Verson, Allied obtained waivers on the debt covenants and was able to renegotiate their terms. (Cplt. at ¶¶ 204, 246).

Finally, any suggestion that Allied and the defendants admitted in an April 1999 press release that they knew about the omissions prior to the end of the class period is misplaced. (Pltf. Reps. at 18). A plain reading of the press release clearly refutes plaintiffs' interpretation of defendants' statements, (Cplt. ¶ 93), especially in light of fact that in March of 1999, Allied explicitly stated to the public that it was informed of the compensation expense omissions "[s]ubsequent to the end of 1998." (*Id.* at ¶ 208). As such, plaintiffs fail to raise a strong inference of fraud with respect to the omission of compensation expenses. Furthermore, having granted ample opportunity for the plaintiffs to plead this claim, the Court concludes that another attempt at pleading would be futile. Therefore, dismissal of this aspect of the plaintiffs' case is with prejudice.

**Deferred Costs and Masked Production Problems.**

On the other hand, the Court is not prepared to wholly dismiss plaintiffs' allegations that the Allied defendants fraudulently deferred the recognition of rising costs at its Verson division and masked known production problems with it's a Presses. Critical to raising a strong inference of conscious misconduct in this case is defendants' admitted improper use of the reallocation method in early 1998. According to Allied's Amended 1998 Annual Report, Verson raised cost estimates on the A Presses in February of 1998 by $5.3 million. (Cplt. ¶ 47). The cost revisions took place after the public release of Allied's 1997 earnings figures but before the filing of its 1997 Annual Report. (*Id.*) However, instead of disclosing the revised cost estimates in the 1997 Annual Report, the defendants chose to reallocate those revisions to the remaining periods of production in 1998. (*Id.*). According to the plaintiffs, the reallocation method has been expressly prohibited in the general professional accounting literature since 1981. (*Id.* at ¶ 48). Furthermore, the reallocation was not even registered until the third quarter of 1998. (1998 Amended Annual Report, Pltf. App., Ex. A at 11). When a restatement was finally announced, the revised cost estimates reduced the 1997 reported income by 26%. (Cplt. ¶ 96).

While a company's overstatement of earnings, revenues, or assets in violation of GAAP does not itself establish scienter, if

combined with other circumstances suggesting fraudulent intent, such allegations may support a strong inference of scienter. *Chu I*, 100 F. Supp.2d at 824. The alleged circumstances surrounding the reallocation raise enough flags for this Court so as to withstand a motion to dismiss. The amount reallocated was relatively large, the actual reallocation was deferred as late as possible, and the accounting violation was, according to the plaintiffs, obvious. Furthermore, the plaintiffs insist that the A Presses constitute a critical part of Allied's business and defendants were daily and monthly appraised of problems with production and cost accounting. Thus, the allegations raise a "strong inference" that the defendants knew or recklessly disregarded, during the class period, that Verson was having difficulty estimating costs with respect to it's a Presses and that costs were dangerously escalating. Despite that knowledge, the defendants chose not to reform Verson's cost accounting procedures or to timely and accurately disclose escalating costs to the detriment of shareholders. The Court now must await the presentation of evidence to determine whether the inference is or is not warranted.

**CONCLUSION**

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part. Only plaintiffs' claim with

respect to the omission of compensation expenses is dismissed with prejudice.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: November 15, 2000